Oral argument not to exceed 15 minutes per side. Mr. Stone for the appellant. Thank you. I am James Stone, Jackson Lewis, and I represent Rubber Associates in this case. A first impression as to the proper calculation of withdrawal liability from a multi-employer fund when a company is forced out of the fund by inaction of a union in the fund. I would respectfully request to reserve three minutes for rebuttal. This court has consistently held that it may create common law under ERISA if one of three conditions are met. When ERISA is silent, when there is an awkward gap in the statutory scheme, where federal common law is essential to the promotion of fundamental ERISA policies. And let me address each of those considerations in reverse order because I think that is critical to this court's consideration and we think the district court erred in its consideration of those issues. The U.S. Supreme Court in one of its first cases to be decided after the Multi-Employer Pension Plan Amendments Act was adopted in PBGC v. R.A. Gray in 1984 stated that changes in the withdrawal rules under the MMPAA, which is the law really at question here, had as its fundamental purpose to discourage employer withdrawals from multi-employer plans. The court held that the MMPAA provided that employers who did withdraw would be required to pay their fair share. The Supreme Court stated that the purpose of the MMPAA was to avoid a downward spiral of companies exiting pension plans. Yet in the case at Barr we have the reverse situation, a case where an employer, Rubber Associates, wanted to stay in a multi-employer plan. Rubber Associates offered to continue making pension payments yet through absolutely no fault of its own, through the complicity of the pension plan and the United Food and Commercial Workers Local Union 80, was forced out of the pension plan. Here. Is the error here that the district court didn't provide equitable relief or the arbitrator did? Well the arbitrator ruled that it was. It couldn't do it. Excuse me your honor. I'm sorry. Arbitrator said he couldn't do it or she couldn't. The arbitrator said it was a union mandated withdrawal. In other words it was not anything that Rubber Associates contributed to. So it did meet the definition as provided by the PBGC in its advisory opinion. The arbitrator ruled he lacked equitable authority to issue the relief that Rubber Associates. You admit that was a correct ruling? I'm sorry. You admit that was a correct ruling by the arbitrator that he could not grant equitable relief? Well we think the, we thought the statute was ambiguous on that issue. We felt the arbitrator could. However, we did not object to that in our argument with the district court, that we believe the district court clearly does have the power. But your best case in support of your position, has any circuit ever declared that, what you're proposing? Well there's a number of cases your honor that hold that courts have the right to fill gaps and there was a case, the Calderon case involving. I understand but what about a gap like this one? Union, there is this case, this is a case of first impression your honor. There is a case for guidance largely on a report by the Pension Benefit Guarantee Corporation that was issued in 1991 at the instruction of Congress and the PBGC examined this issue of union mandated withdrawals and I'll answer your question in a moment but I need to put some context if you will. And the PBGC determined that if there were union mandated withdrawals different methods of calculating withdrawal liability would be appropriate. However. But they left it to Congress. Well they had never. Congress hasn't acted right? Congress has not acted your honor. But the PBGC, but at the time the PBGC said this has never happened. This was an era where funds were much better funded than they were today. So they could not find one instance of a union disclaimer so Congress didn't act because at that time it appeared to be a theoretical question. But two cases have, two courts have cited the PBGC report including the Sixth Circuit and the Finley case that Judge Gibbons was on the panel of. Now we concede that it was cited in dicta. There was not, to your question your honor, it was not a holding. But in neither case, in Crown Cork which, or in other cases in the case in the Sixth Circuit, Finley, was the validity of that PBGC report as at least a guidance contested. Is your position fairly much in conflict with the De Geronimo versus Zemla opinion? No your honor. We think that's very very distinguishable. The De Geronimo, obviously there have been common law exceptions made. De Geronimo was a situation where the plaintiffs were trying, or excuse me, the employers were trying to argue or trying to create an exception for, in the MMPAA, for negligence of fund trustees. In other words if they didn't manage the funds properly then there should be a cause of action for that. That argument has been rejected time and time again. And it, because obviously the implications are extremely adverse to ERISA. If employers could argue that fund trustees didn't invest properly that could create a floodgate of attacks on funds. Here's the situation is a lot different. Here's the situation, this is in the control of the unions and half the fund trustees are union representatives. In fact the person who disclaimed interest in rubber associates was a fund trustee. Here it's completely controllable. This is not something that the fund trustees are going to be liable for because they made some bad investments decisions. This is a situation that is totally preventable. They don't have, unions don't have to disclaim interest. Funds don't have to support that. And that's what occurred here. I think that case is inapplicable because it involves a much different factual situation, I mean radically different factual situation. We believe in actuality that it's imperative that the court does grant equitable relief here. Many union, as I mentioned and as the court certainly knows, many union pension funds today are severely underfunded. And the fund here is as well. And most of these funds and unions have very close relationships. The absence of any consequences for union mandate withdrawals provides a clear incentive to unions working with pensions funds, which they partly control, to issue a disclaimer of interest in order to penalize weak employers to collect additional withdrawal liability, particularly with an employer like rubber associates where there's only a very 2% of their employees are even vested in the fund. And such disclaimers would then help fund the plan for the potential benefit of other larger employers and the union at the expense of smaller, weaker employers. We think that in the long run, this would be very... I still don't understand why it isn't up to Congress to fix this. Assume that you're correct that this is a terrible problem. Why isn't it something that Congress should fix with legislation? Well, certainly Congress could fix it with legislation, but 1451 does charge the courts with making common law. And the reality is, Your Honors, that Congress... While I think this is potentially a massive problem, there are a lot of problems that Congress has chosen not to fix that need addressed. And the courts are charged under ERISA with the ability to fix this issue. It's not that we're asking the courts to go beyond its statutory grant. And the courts have in a case of fraud, but not just in the case of fraud. In a situation where a union expelled a... Or excuse me, a fund expelled a employer from a fund. In a situation where calculations by the fund exercised excessive withdrawal liability on a company. Which case is this? That case is Central States, Your Honor. Well, your situation is very difficult for the rubber associates. I understand that. I feel sorry for rubber associates because they got hit by a big amount of money to pay up. But didn't the pension fund just take advantage of that under ERISA? They knew what to do. Well, we believe certainly, yes, that the union and the fund knew... Since the person who just claimed interest was a union fund trustee, she certainly knew the impact of what she was going to do, what the union was going to do. But the key situation to us, Your Honor, is that this was completely without any action of rubber associates. You'll have the... Appellees will cite various cases, Thompson, for instance, among others, where the company's unions disclaimed interest. But those cases either involved unfair labor practices or involved decertifications or involved other things that the company could have foreseen and could avoid. The purpose of the MMPAA amendments was to keep employers in funds. Here, we have a situation  where the MMPAA is not in the funds. The purpose is to assure that there is money to pay pensions. Sure, in part, of course. So it's not necessarily to keep the employer in, but to say to employers, if you're going to get out, you have to pay. It was to... But it's a little broader than that, Your Honor, respectfully. The purpose really was to prevent... If there had been, before the MMPAA, if there had been two employer withdrawals around the country, I don't think the Congress or the law would have ever been passed. What they wanted to avoid was a downward spiral of more and more employers pulling out of plants. Here, we have the exact reverse of that situation, as I mentioned. I think, ultimately, while the Appellees poo-poo this argument, I think, in the long run, this will be very... Especially once there's a Court of Appeals decision on this, this will be destabilizing for the whole multi-employer scheme because employers, faced with the fact that a union could disclaim interest at any time, or almost any time, and then the fuss forced them out of the fund, is going to cause great consternation among employers, and they're going to look for opportunities to get out whenever the withdrawal liability may drop a little bit. So I think, by giving this much power to the unions and to the funds in complicity with the unions, it will be, ultimately, very destabilizing because you're creating a situation that is absolutely unavoidable. Certainly there are situations that employers are involuntarily forced out of, but this one is totally something where the employer did, and the record shows, the employer did everything possible to stay in the fund, and yet were forced out of it anyway. They were painfully aware of the possibility, and they did absolutely nothing to create the situation. What kind of equitable relief would you have the court to do? Your Honor, I'm almost out of time, but if I may answer your question. The PBGC provided guidance on this issue, and again, the reason that the PBGC report was not adopted was because, at the time, there had been no forced withdrawals. In fact, the PBGC said, if you ever need it, here's what the rules are and the guidances. The PBGC suggested three methods. One was a method involving calculations, which the fund just doesn't have available, so we weren't able to even examine that. The third method involved setting up your own defined benefit pension plan, which, for a real small employer like this, is impractical. The second method was the only method that's practical, and that's called the direct attribution method. And basically, that is – and Rubber Associates has never said they shouldn't pay anything. The – what the PBGC recommended in this situation was that the – where a company was forced out because of a union action, that the employer should pay its proportional share directly related to its participants in the plan. And how much would that be here? That would be $312,000 in unrebutted expert testimony. Okay. Your red light's been on for a while. Yeah. I'm sorry. Thank you, Your Honor. It's time for rebuttal. That would be good. Yeah. Thank you, Your Honor. May it please the Court. Mr. Stone.  I'm a former labor workers union employer, pension fund, and the individual trustees of the fund. Since the Ninth Circuit decision in the Thompson case in 1984, where that court stated that a union-mandated withdrawal is not a basis for a reduction in assessment of withdrawal liability, no court has reduced an assessment of withdrawal liability based upon a union-mandated withdrawal. And as the Supreme Court basically explained in the Concrete Pipe decision in dealing with an array of arguments by the employer that this is just unfair to us, and we do see some of these arguments of unfairness for contributing employers, there the employer had not a single employee with vested benefits, and the Supreme Court said Congress has acted and we're going to enforce the laws written. Since the 1991 PBGC study report, and that's what it was, a study report, Congress has acted. They acted in 2006 when they again amended the Pension Protection Act, and they strengthened protections for plan and planned participants in the case of withdrawal liability, mostly at the expense of the employer, and those specific amendments to the rules are in our brief at page 40. And again, just last year in 2014, when Congress allowed trouble plans to suspend benefit payments in some circumstances, but the cost savings from benefit suspensions have to be ignored in calculating withdrawal liability. Congress was aware. Congress was told not to act by the PBGC. Congress did not act to create this exception, but it has acted in this field in meaningful ways since that report. No court has reduced withdrawal liability based on this union-mandated withdrawal theory. It's been mentioned a couple times, the Crown case, a New Jersey District Court opinion, and there they said, well, we're not going to forego interim payments because even under this withdrawal liability theory per the PBGC study report, they'd still owe something. This court, in the Findley opinion, actually took a very meaningful look at the extent of a court's ability to exercise equitable relief in face of the clearly articulated statutory scheme that we see in ERISA and the MPPAA. In Findley, the employer was involved in a labor dispute, ceased contributions, and then apparently the union declared a union-mandated withdrawal. The employer went to federal court for injunctive relief, claimed no obligation for withdrawal liability because the withdrawal occurred during a labor dispute, and claimed no requirement to arbitrate based on the union-mandated nature of the withdrawal. In the majority opinion, and Judge Moore and Judge Gibbons, as you're aware, this court held that the use of the court's equitable power, in that case to enjoin interim payments, in this case to create an entirely new formula for withdrawal liability, after examining the rules in the other circuits, determined that the Supreme Court has ruled that when district courts are properly acting as courts of equity, they have discretion unless a statute clearly provides otherwise. And this court in Findley decided to follow the clear language involving withdrawal liability in the statute, in that case to order interim payments, quoting again from that decision, once the pension fund has demonstrated that it complied with the statutory requirements for calculating liability and notifying the employer, we're not going to interfere with the comprehensive statutory scheme. There was a specific provision directing conduct, and that took precedence over a more general one, especially, as this court observed, when the requested relief runs counter to the purpose of ensuring stability, viability of the fund. And this court even accepted that that ruling could result in unfair results, again quoting, where Congress has already spoken specifically on an issue, it is not the role of this court to remedy those situations. Your Honors, it's hard to imagine a more pervasively regulated and legislative scheme than ERISA, especially as amended by MPPAA in 1980. Robert Associates... Suppose this issue came before Congress. Should Congress act? Is this a serious problem that Congress should remedy? I think the limited number of incidents since 1984, the Thompson decision, and the fact that the PBGC said this, this comes up very, very rarely. And the fact that we've seen none of the parade of horribles suggested in the PBGC report itself says it's in the opposite of the union's interest to walk away from dues-paying members. If I was Senator Wolf and I was considering, I would say no, but I certainly understand the argument contra, but it's a policy argument. Congress could take action to clear up this. Absolutely, Your Honor. In your personal experience, is it something that occurs frequently? I mean, I know you just said there are union disincentives, and in 1991 it wasn't happening, but is it happening more often? You know, I'm more of a litigator than a traditional labor lawyer, but it's certainly not something that happens in my world at Little or Mendelsohn that we see in any sort of frequency. And as the facts of this case demonstrate, I mean, this was a very hard-fought negotiation, a hard-fought strike, imposition of final terms by the employer, all of which they had the lawful right to do, but it takes two to tango. And this scenario here shows the very dangerous path we go down when we start attributing fault to one party only. When the parties reach impasse, the union loses a strike and disclaims interest. The three-part test of Geronimo v. Zemla, number one, ERISA is silent or ambiguous, two, there's an awkward gap in the statutory scheme, and three, federal common law is essential to promote ERISA policies. Literally none of those three are in existence here. We ask the question posed by this court in Geronimo v. Zemla. In that case, refusing to create a cause of action on behalf of the employer for negligent mismanagement of the fund, what fundamental ERISA policy would be served? And in fact, the result that rubber associates seeks is contrary to ERISA's stated purpose, to protect participants' rights to collect benefits. Congress was very clear on what its intent was and codified that intent in 1980 in the MPPAA. And the policy was, quoting, to provide reasonable protection for the interests of participants and beneficiaries of financially distressed multi-employer pension plans and provide a financially self-sufficient program for the guarantee of employee benefits under multi-employer plans. All of the legislative history, all of the court discussion of the purpose is to ensure the viability of the plan, to make sure if somebody is promised a pension and they do what they need to do to earn that pension, they can in fact receive their pension. And it's hard to think of a more comprehensive scheme. As the Supreme Court said in the Knutson case, because ERISA is a comprehensive and reticulated statute, courts should be especially reluctant to tamper with the enforcement scheme embodied in the statute. Here there are four specific formulas that a fund is allowed to use once a withdrawal has been declared, the presumptive, the modified presumptive, the rolling five, and the direct attribution method. And unless the fund trustees adopt an alternative calculation method for the plan with PBGC approval or amend the plan to adopt another method in ERISA 4211, ERISA requires the withdrawal liability be calculated using the statutory presumptive method, exactly as what's done in this case. There is a procedure that Congress has enacted. If you want to change your calculation, you have to petition the PBGC. They have to give you approval. Governor Associates said it will take one of those methods, but you're saying they don't have the option to do so. They're not seeking the direct attribution method. They are seeking the modified direct attribution method. And although I don't profess to understand the math behind these various formulas, the problem is the PBGC will only give approval for an alternate formula if it would not significantly increase risk of loss to plan participants. The modified direct attribution method, which was discussed as one choice of three in a study report that never became the law, does not provide for rubber associates to be allocated a share of unfunded vested benefits that cannot be collected from withdrawn employers. So actually, the modification to the direct attribution method would make it How much would they have to pay on the direct attribution without the modification? Do you have any idea? I do not know, Your Honor. The amount was in the area of 1.7 under the presumptive method, but they also have opted for the 20-year payment plan, and as Your Honors also know under the law, and this is another acknowledgment of the situation employers may be in. There's a stream of payment for 20 years, and then the obligation ends, even if the entire sum has not been paid. And I think the present value of that amount is under seven figures, actually. The exceptions that have been noted involve expulsion. There's nothing in the law to deal with that. If there's a promissory stop-up claim that a participant has, the court might enforce that promise, where an employer is fraudulently induced to participate to enter a plan. That is another situation. That is a far, far cry from creating an entire new calculation for assessing withdrawal liability when the Congress sets out the choices and gives you a very detailed procedure if you want to use another choice and then limits that ability. One thing that was raised in the briefing, as I recall, was that the argument that your opponent was making that there was collusion between the fund and the union is, I guess, analogizing to fraud. I realize I'm going beyond what you were just talking about, but you're mentioning the word fraud caused me to think about that. Right. So here is what is pointed to in the record to support. First of all, there's no allegation that the fund acted in violation of any of its statutory obligations. In fact, it's stipulated that we assessed withdrawal, that there was a withdrawal, and we properly assessed liability under the presumptive method. So the only question is, should we have used a new method that's found nowhere in ERISA? Unlike the Kalterherian case, the Third Circuit, where there was fraudulent inducement, here, first of all, fraud wasn't alleged. But for there to be collusion, there needs to be some sort of a fraudulent misconduct. So what are the allegations? Number one, half of the trustees are union trustees, including union trustees involved in the very bargaining relationship with this employer. Well, that's the Taft-Hartley Act. That's the LMRA of 1947, Section 302c.5, that requires the employers and the union to be equally represented, and the union representatives in the fund are going to be the union membership. That is the law. And if Congress thinks that creates an awkward or unfair situation, only they can change it. So this will happen in every single case, you're saying, if the law requires this overlap of trustees? Right. You might not have the situation where one of the trustees was actually the union official who signed the letters saying that we disclaim interest, but you're always going to have the leadership of that local union. Absolutely. That's who serve on these Taft-Hartley funds. They say that we share space with the union. We rent space, actually. Once again, that is a practice so common that the Department of Labor issued a prohibited transaction class exemption to specifically allow for this to continue. Finally, they point to the fact that we relied upon our actuary from the Siegel Company, Henry Wong, his opinion that during negotiations they were at $0.62 contributions. Rubber Associates wanted to limit the contribution to $0.30. Our actuary told us that the contribution rate would actually have to be increased to $1.00 and a penny in order to allow the participants to continue to accrue benefits. When Rubber Associates sought to reduce their contribution to $0.30 during a time when the fund was in critical status, the actuary, Siegel and Company, opined that the fund would be in a better funding status from a complete withdrawal than from allowing Rubber Associates to slash its pension contributions. That was the obligation of the fund, to rely upon the actuary's best advice, and by analogy, the Chicago Truck Driver, Helpers, and Warehouse Workers Union case, the Seventh Circuit Judge Posner, found it reversible error that the fund did not consistently rely upon the Siegel Company's best estimate in that case, which dealt with interest assumptions. In conclusion, Your Honors, in her opinion, Judge Loy refused to rely on the PBGC study report and create special rules for union-mandated withdrawals. In fact, she noted, the parties do not dispute that Congress has not acted on the report, amended ERISA, or adopted any special rules or methods for calculating employer withdrawal liability in the case of union-mandated withdrawals from a multi-employer fund. She refused to grant equitable relief to reduce the withdrawal liability assessment indisputably correctly calculated in accordance with ERISA's presumptive calculation method. This Court should affirm her well-reasoned opinion. And I thank you for your time. Thank you, Mr. Wolff, and Court. Make no mistake, this, in our view, is a very significant case. To respond to the judge's earlier question, we have the irony of the two largest employer law firms in the country arguing this case, and just as Mr. Wolff said, he doesn't see it and is not concerned at Littler-Mendelson, at Jackson-Lewis. We are very concerned. First of all, the fund argues several things inappropriately. First of all, it argues evidence. This is on a motion to dismiss that the fund filed. Facts have to be construed, as the Court well knows. As pled, they cannot go into the record and question things. I do not think Mr. Wong's comments were quite as innocuous as Mr. Wolff stated. But to me, the critical thing here, as far as collusion goes and complicity, and we're not claiming it's fraud. What did you say in the claim that you were making as to collusion? What exactly did you say? We said, to us, the most seminal issue is the fact that Ms. Caruso, who is a fund trustee, is the very person who disclaimed interest. And she was at meetings where Mr. Wong and others discussed that the fund would be ahead if they collected withdrawal liability. And that's in your claim, your statement? Yes, yes, Your Honor. And certainly there are supporting facts, a couple of which Mr. Wolff referred to, the fact that the union officials had more than just rented space. I mean, they had full access to the fund offices. But the most important thing is that Ms. Caruso was the person who disclaimed interest. So she was very aware of the fact that this withdrawal liability would be assessed. What was her role? She was the principal union negotiator. Okay. And also a lawyer. Is she a union member or the president? She's a union official. I don't believe she's a lawyer. She's a union official. She's, I believe, a paid member of the union. Also, I believe Mr. Wolff miscited Finley, which Judge Moore and Judge Gibbons were part of the panel on. There, the case fundamentally dealt with the obligation to arbitrate and also adjunctive relief. But the court specifically stated and reviewed the PBGC report, did not say that it was not a source of guidance. It simply said that, I quote, there's a preliminary problem with Finley's argument. The study report defines union mandate withdrawal as requiring that the fund refuse to accept continued contributions proffered by the employer. Finley did not proffer continued contributions. Instead, it informed the fund it would not pay. We offered to pay. We have consistently offered to pay. And we have consistently met all our obligations, even while this case has been pending. So we don't believe this case. The court ruled on that issue. Finally, the fund mentions that the PBGC approval is required in any situation. The courts did not require that in Bonringer, Coltrane, Central States, Mason-Dixon, and a number of other cases. That would eliminate 1451 as a claim in our view. So thank you, Your Honor, for your time. Thank you both for your argument. The case will be submitted.